United States District Court
Southern District of Texas
**ENTERED**
March 30, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM A. WARE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-0848 |
| | § | |
| UNITED STATES FEDERAL HIGHWAY, | § | |
| ADMINISTRATION, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

**I.     Background**

In 2011, William Ware sued the U.S. Federal Highway Administration, the U.S. Department of Transportation, and various agency officials under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., challenging the noise impact of a large highway-construction project. The Texas Department of Transportation ("TxDOT") intervened as a defendant. After five years of litigation, Ware has one remaining claim: he alleges that in 2013, the defendants failed to comply with § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, and § 18(a) of the Federal-Aid Highways Act, 23 U.S.C. § 138, in assessing the impacts of the challenged highway-construction project on a nearby park and arboretum. Ware asks this court to issue a declaratory judgment finding a violation and to issue an order compelling the defendants to conduct an environmental-impact analysis under Section 4(f).

The project Ware challenges involves 38 miles of construction along Highway 290 to Interstate Highway Loop 610 in Houston, Texas. It is referred to as the Highway 290 project. The

1

project is currently under construction.  It has been changed over time, in part responding to information about environmental and noise impacts.  The defendants have analyzed the Highway 290 project's environmental effects and issued a series of environmental-impact statements.  TxDOT first evaluated the environmental impacts of the project in 2010, issuing a Final Environmental Impact Statement in May of that year.  (Docket Entry No. 32, Administrative Record (AR) 839–41).  The Federal Highway Administration issued a Record of Decision approving TxDOT's Final Environmental Impact Statement in August 2010.  (Docket Entry No. 32, AR 945).

In March 2011, TxDOT completed its first reevaluation of the Final Environmental Impact Statement, focused on the first phase of the project.  In July 2012, TxDOT completed a second reevaluation, focused on the area covered by the first part of the second project phase.  In October 2012, TxDOT completed a third reevaluation of the Final Environmental Impact Statement, focused on the area in the second part of the second phase.  TxDOT completed its latest Final Environmental Impact Statement reevaluation, the fourth, in August 2013.

In this last reevaluation, TxDOT studied the Highway 290 project's noise impacts and how they might be mitigated.  TxDOT used the most recent traffic-noise model, TNM 2.5, that the Federal Highway Administration had approved.  In the earlier reevaluations, TxDOT had used TNM 2.1, the then-approved traffic-noise model.  TNM 2.5 replaced TNM 2.1 in April 2012.  TxDOT's fourth and last reevaluation also examined the project's interim design phase, minor design changes, the use of reversible lanes to accommodate peak traffic, tolling options, managed lanes, detention ponds, lighting, right-of-way changes, and schematic adjustments.  (Docket Entry No. 85, Exs. 1–4 (Record of Decision and Appendices)).

The Federal Highway Administration issued a Revised Record of Decision in September

2

2013, approving the fourth TxDOT reevaluation of the Final Environmental Impact Statement. (Docket Entry No. 85).  The 2013 Revised Record of Decision proposed "additional and revised noise walls" to benefit certain residential areas and restaurants with outdoor seating.  (Docket Entry No. 85, Ex. 1 at p. 24).  The Federal Highway Administration relied on the results of the TxDOT noise-impact study to conclude that "the impact of projected traffic noise levels of the proposed highway project do not exceed the [federal] noise abatement criteria as contained in 23 C.F.R. § 772, Table 1."  (Docket Entry No. 85, Ex. 1 at p. 13).  The Revised Record of Decision specifically addressed the question at issue here, whether the noise impacts on the park and arboretum would exceed permissible levels because of increased traffic from the project.  The Revised Record of Decision stated that "any park that is located approximately 400–500 feet or more from the edge of pavement would experience noise levels below the noise abatement criteria for parks . . . ."  (*Id.*). It is undisputed that the park and the arboretum are more than 400 to 500 feet from the edge of the roadway pavement.

After completing the Revised Record of Decision, the federal defendants notified the court of the final agency action.  (Docket Entry No. 85).  This action, which had been administratively closed, was reinstated to the active docket.  (Docket Entry No. 88).

Ware appears to challenge the 2013 Revised Record of Decision's conclusion, and the process by which it was reached, that "any park that is located approximately 400–500 feet or more from the edge of pavement would experience noise levels below the noise abatement criteria for parks."  He contends that the defendants acted "unreasonably" as a matter of law when they issued the 2013 Revised Record of Decision because they did not comply with the procedures in Section 4(f).  Ware alleges that if the defendants had complied with Section 4(f), they would have allowed

3

public notice and comment, conducted hearings or other procedures to analyze the risk of increased noise levels in the nearby park and arboretum, and obtained written consent from the Houston City Council for the unspecified "work."  Although construction on the project is ongoing, and although Section 4(f) is premised on the evaluations occurring before relevant construction starts, Ware seeks an order compelling the defendants to perform another evaluation at this advanced project stage.

The defendants counter that they complied with Section 4(f) in concluding that noise levels at the park and the arboretum would not exceed the relevant standards and that no further environmental-impact analysis was required.  To the extent Ware challenges the conclusions they reached, the defendants argue that the record shows that they did not act arbitrarily and capriciously. The defendants also contend that Ware lacks standing to assert his claim under the APA because increased noise in the park and arboretum—the two locations Ware invokes as the basis for his standing to sue—is not a concrete, particularized, and actual or imminent injury; is not fairly traceable to the agency inaction Ware challenges; and is not redressable with an order compelling a Section 4(f) evaluation.

Ware moved for summary judgment that the defendants' decision not to perform a complete environmental-impact analysis on the park and arboretum noise levels violated Section 4(f). (Docket Entry No. 133).  The defendants cross-moved, seeking summary judgment that Ware lacked standing to sue and that the 2013 Revised Record of Decision was not arbitrary and capricious. (Docket Entry Nos. 139, 140).  Ware responded and moved to supplement the administrative record. (Docket Entry Nos. 142–44).  The defendants moved to strike the extra-record evidence Ware sought to submit.  (Docket Entry No. 145).  Based on a review of the motions, the briefs and submissions, the pleadings, the administrative record, and the applicable law, the court grants the

defendants' cross-motions for summary judgment, denies Ware's motion, denies the motion to supplement, and grants the motion to strike.  An order of dismissal is separately entered.

The reasons for these rulings are explained below.

## II.   Discussion

### A.   The Legal Standards

#### 1.   Summary Judgment Under Rule 56

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536,

5

540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (alteration omitted) (quotation marks omitted).

### 2.    Standing

"The 2013 Revised Record of Decision approving the 290/610 highway project is the only final agency action . . . at issue in this case," and "[t]here is no subject-matter jurisdiction over . . . challenges . . . based on the earlier Records of Decision or earlier versions of the project." (Docket Entry No. 113 at p. 5). "The September 2013 Revised Record of Decision supercedes." (*Id.*).

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1146 (2013). "One element of the case-or-controversy requirement is that [the plaintiff] . . . must establish that [he or she has] standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "To have standing to sue, the plaintiff must demonstrate injury in fact that is fairly traceable to the defendant's conduct and that would be redressed by a favorable judicial decision." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396 (5th Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

"[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quotation marks omitted). APA zone-of-interest standing "is not meant to be especially demanding." *Id.* (quotation marks omitted). "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (quotation marks omitted).

As "[t]he party invoking federal jurisdiction," the plaintiff "bears the burden of establishing [standing]." *Lujan*, 504 U.S. at 561. The plaintiff must meet this burden "with the manner and degree of evidence required at the successive stages of the litigation." *Cornerstone Christian Schs.*

*v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009) (quotation marks omitted). "When the defendant moves for summary judgment because of lack of standing, . . . the plaintiff must submit affidavits and comparable evidence that indicate that a genuine issue of fact exists on the standing issue." *Assoc. of Cmty. Org. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (quotation marks omitted).

### 3.    The Claims Under Section 4(f)

Sections 4(f) of the Department of Transportation Act and 18(a) of the Federal-Aid Highways Act contain substantially the same language and are together referred to as Section 4(f). *See, e.g.*, *Druid Hills Civic Ass'n, Inc. v. Fed. Hwy. Admin.*, 772 F.2d 700, 704 n.2 (11th Cir. 1985); *Coal. to Pres. McIntire Park v. Mendez*, 862 F. Supp. 2d 499, 509 (W.D. Va. 2012). Section 4(f) reflects "the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). Section 4(f) allows the Secretary of Transportation to approve a federal highway project that uses public park land only under limited conditions. First, the Secretary must find that "there is no prudent and feasible alternative to using that land." 49 U.S.C. § 303(c). Next, if the Secretary determines that there are no feasible and prudent alternatives to using the park land for the project, the Secretary must ensure that the project includes "all possible planning to minimize harm to the park . . . resulting from the use." *Id.*; *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1216 (11th Cir. 2012). The Secretary's Section 4(f) evaluation is to be completed before work on the project begins. *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 400 (4th Cir. 2014); *Corridor H Alts., Inc. v. Slater*, 166 F.3d 368, 373 (D.C. Cir. 1999).

A Section 4(f) analysis is required when land is "use[d]."  49 U.S.C. § 303(c).  "Use" is broadly construed to include both physical and constructive use.  It encompasses, for example, constructive use of park land based on a project that is proximate to, but does not transverse, the park land.  23 C.F.R. § 774.17; *see, e.g.*, *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1015 (10th Cir. 2012); *Citizen Advocates for Responsible Expansion, Inc. (I–CARE) v. Dole*, 770 F.2d 423, 441 (5th Cir. 1985); *Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir. 1982) (a highway project that was next to a park "used" the park).  A constructive use occurs when:

> [T]he transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired.  Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished.

23 C.F.R. § 774.15(a).

A project can constructively use park land if the project produces severe noise impacts within the park.  23 C.F.R. § 774.15(e)(1); *see Audubon Naturalist Soc'y of Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 679 (D. Md. 2007).  "The projected noise level increase attributable to the project [must] substantially interfere[] with the use and enjoyment of a noise-sensitive facility of a property protected by Section 4(f)."  23 C.F.R. § 774.15(e)(1).  Substantial interference can occur when noise-level increases impair the "[e]njoyment of an urban park where serenity and quiet are significant attributes."  *Id.* § 774.15(e)(1)(iv).  A park's proximity to a project is not enough to show constructive use.  *Audubon Naturalist*, 524 F. Supp. 2d at 679.  A noise-level increase is not constructive use if

> [t]he impact of projected traffic noise levels of the proposed highway project on a noise-sensitive activity do not exceed the FHWA noise abatement criteria as contained in Table 1 in part 772 of this chapter, or the projected operational noise

> levels of the proposed transit project do not exceed the noise impact criteria for a Section 4(f) activity in the FTA guidelines for transit noise and vibration impact assessment.

23 C.F.R. § 774.15(f)(2).  For public parks, the projected noise levels must not exceed 67 A-weighted decibels.  23 C.F.R. § 772, Table 1.

"As Section 4(f) does not provide an independent cause of action, judicial review is available only through Administrative Procedure Act . . . ."  *Valley Cmty. Pres. Comm'n v. Mienta*, 373 F.3d 1078, 1084 (10th Cir. 2004).  The plaintiff has the ultimate burden of showing that park land will be constructively used.  *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'gs*, 374 F. Supp. 2d 1116, 1153 (S.D. Fla. 2005) (citing *Sierra Club v. Lynn*, 502 F.2d 43, 52 (5th Cir. 1974)).

### 4.      Review of Agency Determinations Under the APA

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "The entire case on review is a question of law."  *Id*. (quotation marks omitted).  "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.*

Under the APA, agency action may be held unlawful and set aside only if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  "The arbitrary and capricious standard is highly deferential."  *Knapp v. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015) (quotation marks omitted).  "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made . . . ."  *Id.* (quotation marks omitted).  Indeed, agency action is arbitrary and capricious "only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Wilson v. U.S. Dep't of Agric.*, 991 F.2d 1211, 1215 (5th Cir.1993) (quotation marks omitted).  "The agency decision need only have a rational basis, and it does not have to be a decision which the court would have made."  *Id.*  In reviewing a challenge to the agency's decision, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Luminant Generation Co., LLC v. EPA*, 714 F.3d 841, 850 (5th Cir.2013) (alteration omitted) (quotation marks omitted).

Agency decisions under Section 4(f) are reviewed under the arbitrary-and-capricious standard.  *See Prairie Band*, 684 F.3d at 1023; *Bitters v. Fed. Highway Admin.*, No. 14-cv-1646, 2016 WL 159216, at *12 (E.D. Cal. Jan. 13, 2016) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971)); *see also Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992) (an agency's decision "not to prepare [an environmental-impact statement] is reviewable under the 'arbitrary and capricious' standard." (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989))).

### B.    The Record Evidence Supporting Ware's Standing to Sue

The defendants seek a summary judgment that Ware lacked standing to bring his claim to enforce Section 4(f) under the APA.  The summary judgment evidence includes an October 2011 declaration Ware submitted about how increased noise from the highway project negatively affected

11

his visits to Memorial Park and the Houston Arboretum.  (Docket Entry No. 36, Ex. 1).  Ware supplemented the declaration in his summary judgment response with an August 2015 declaration. (Docket Entry No. 143, Ex. 2).

### 1.    Ware's 2011 Declaration

Ware's October 2011 declaration stated that he has lived near Memorial Park and the Houston Arboretum since 1987.  "Over these many years, [he has] taken many walks into Memorial Park and the Arboretum and well appreciate[s] the noise level changes around [his] home and [his] greater walking neighborhood, which includes these parklands."  (Docket Entry No. 36, Ex. 1 at p. 1).  Ware explained that he sought "to have several known and harmful and quite injurious highway noise impacts identified for the record and also analyzed for possible mitigation measures that would be allowed by the noise and parkland regulations."  (*Id.*).  He asserted that the Houston Arboretum's noise-level increases should have "disqualified" previous construction projects "starting in 1992, or for sure . . . in 2001 when the nature of the [highway] reconstruction changed radically."  (*Id.* at 2).  Ware discussed Texas Department of Transportation studies from 1992 and 2000 and their alleged deficiencies.  (*Id.* at 2–3).  He alleged a "false statement" made in a recent environmental-impact statement about noise-impact studies in 2001 and 2003, and he recounted how he had raised concerns about noise levels in 2007 and again in 2010.  (*Id.* at 3–4).

His main conclusion appeared to be that:

The noise level in the parklands has only increased since 1992 for several reasons, including greater traffic counts over more of the day, higher roadway elevations that allows noise to maintain higher levels further out from the highway, the lack of any mitigation measures, such as transparent edge walls, and the neglectful use of the noisiest concrete tining possible.  Tining is a safety measure, but there are other styles that are not as noisy.

(*Id.* at 2).

### 2.      Ware's 2015 Declaration

In the supplemental declaration, Ware stated that he had "suffered continuing highway noise impacts, or injuries, in both [Memorial Park and the Houston Arboretum], since the completion of the IH-610 West Loop Project and the IH-10 Project that occurred sometime around 2006 to 2008." (Docket Entry No. 143, Ex. 2 at p. 1).  Ware stated that he suffered these injuries "while jogging in Memorial Park" and "while walking in the Arboretum and Nature Center along its trails."  (*Id.*). Ware stated that he is a "fairly regular jogger and exerciser" who became a "regular user" of Memorial Park and the Houston Arboretum in 1987.  (*Id.* at 2).  He stated that "[b]etween 2003 and 2008[,] the IH-610 West Loop Reconstruction Project (with massive elevation of the main-lanes and connector lanes) and the even more massive IH-10 Katy Freeway Project (from west of Houston to almost downtown) were started and completed."  (*Id.* at 3).  Ware described the effects he observed from this construction on the park and arboretum:

> After this construction I noticed that higher levels of highway noise were impacting the north side of Memorial Park at the Tennis Center and on the adjacent and continuous jogging path that extends some 3 miles looping around the golf course and having a stretch along Memorial Drive.  The noise levels on the north side of Memorial Park had definitely become louder. . . .
>
> My wife and I still jog in the Park and visit the Arboretum, particularly during the Spring and Fall when the weather is more temperate.  In those outings, I still continue to suffer noise impact injuries.

(*Id.*).

Ware stated that several months before the date of his declaration, he and his wife used a hand-held noise meter to measure noise levels in the Houston Arboretum.  He alleged that they were greater than the lawful maximum noise levels set for that area.  (*Id.* at 4).  Ware attributed the noise

13

levels to the highway-construction work from 2003 to 2006:

> In the 2003 to 2006 reconstruction of the IH-610, the design did increase the number of functional lanes (thus capacity) and it did increase the elevations of the overpasses (which allows noise to more easily penetrate farther inside the Arboretum, and it also added transverse tining (or tiny grove [sic] cuts spaced at one inch apart) to the access roads and main-lanes.

(*Id.*).  Ware went on to describe "previous [Texas Department of Transportation] noise predictions for the arboretum" in 1992, 2001, and 2004.  (*Id.*).

Ware concluded the 2015 declaration by criticizing the Texas Department of Transportation's use of "transverse tining" to reduce or mitigate noise levels in previous projects.[1] Ware stated that "[t]he one inch spaced transverse tining is the worst possible tining you could choose . . . [because it] reinforces any existing noise level relative to a non-tined roadway." (*Id.* at 5).  Ware stated that using tining "[made] . . . the Arboretum less than enjoyable for humans" and "[drove] away many animals." (*Id.*).  Ware pointed out that the Department no longer uses transverse tining but rather longitudinal tining.  He asserted that longitudinal tining is "not as bad for noise," but it is not what should be used.  Instead, he asserted that "[r]andom spaced tining is the better way to go." (*Id.*).

### C.    Standing

Ware seeks a declaratory judgment that the defendants violated Section 4(f) and an order compelling them to conduct an environmental-impact analysis complying with the statute.[2] *See* 5

---

[1]  Tining is a type of concrete pavement designed to be resistant to wear from studded tires.  *See* Wash. Dep't of Transp., *Performance of Concrete Pavements with Longitudinal Tining, Transverse Tining, and Carpet Drag Finish* 1–2 (May 2012), http://www.wsdot.wa.gov/research/reports/fullreports/637.2.pdf.

[2]  It is unclear whether Ware asserts an APA claim against both the federal defendants and the Texas Department of Transportation.  Section 4(f) imposes obligations on the Secretary of Transportation; it does not apply to state actors.  It is also unclear whether the court would have jurisdiction to grant Ware

U.S.C. § 706(1) (authorizing "[t]he reviewing court [to] compel agency action unlawfully withheld or unreasonably delayed").  Ware asserts that he is "a nearby resident and a frequent visitor at both Memorial Park and the [Houston] Arboretum," and that he "suffers a continual degradation of his enjoyment of the park as a result of the unmitigated, increasing noise, all of which is from traffic impacts from federal aid highways."  (Docket Entry No. 133 at p. 15–16).  Ware contends that compelling a Section 4(f) evaluation "would help with preservation of the parklands and lower any level of constructive use."  (*Id.*).

### 1.    Injury

Because Ware seeks an order compelling the defendants to comply with the procedural requirements of Section 4(f), he presents the type of "procedural rights case," *Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998), that "loosen[s] the strictures" of the standing inquiry, *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  "This does not mean, however, that a procedural rights plaintiff has standing merely because of the government's failure to comply with the relevant procedural requirements." *Glickman*, 156 F.3d at 613.  "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in*

---

declaratory relief against the Texas Department of Transportation under the APA. With exceptions not relevant here, an "agency" under the APA "means each authority of the Government of the United States." 5 U.S.C. § 701(b)(1).  The APA provides "a route through which private plaintiffs can obtain federal court review of the decisions of federal agencies." *Belle Co., L.L.C. v. U.S. Army Corps of Eng'gs*, 761 F.3d 383, 392 (5th Cir. 2014) (quotation marks omitted).  The APA does not authorize judicial review of state-agency action.  Yet at least three circuits have held that a state-agency defendant may be enjoined under the APA if the challenged state and federal projects are sufficiently interrelated. *Citizens for Smart Growth*, 669 F.3d at 1210; *Sw. Williamson Cty. Cmty. Ass'n Inc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001); *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992).  This approach appears inconsistent with Fifth Circuit precedent. *See Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453, 456 (5th Cir. 1989) ("We fail to understand . . . how APA-dictated reviewability of [federal-agency action] gives the district court jurisdiction to enjoin . . . nonfederal entities . . . .").  The court need not decide this issue in light of Ware's lack of standing.

*vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. "Instead, the plaintiff must show an injury that is both concrete and particular, as opposed to an undifferentiated interest in the proper application of the law." *Glickman*, 156 F.3d at 613.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Environ. Servs., Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Ware's declarations state that he frequently exercises in Memorial Park and the Houston Arboretum and that increased noise levels negatively affect their recreational value to him. Ware did not allege that he stopped going to the park or the arboretum, reduced the time he spent there, or derived no enjoyment from his use. *Compare with id.* at 181–84 (plaintiffs who stopped fishing, camping, and walking near river because of pollution had standing). Ware's only allegation was that the noise increase made his visits less enjoyable. Although Ware's injury rests near the outer limits of the injury-in-fact requirement, the declaration that Ware's regular park visits are less enjoyable because of increased noise appears to be enough to raise a factual dispute material to determining whether that injury is constitutionally cognizable. *See id.* at 181 ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."); *Summers*, 555 U.S. at 494 ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); *Morton*, 405 U.S. at 734–35 ("We do not question that [aesthetic and ecological] harm may amount to an 'injury in fact' sufficient to lay the basis for standing."); *cf. Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("[A]n individual can establish

16

'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.").

### 2.    Traceability

"[T]he plaintiff must [also] establish that the injury is fairly traceable to the proposed government action or inaction." *Glickman*, 156 F.3d at 613.  "[A] plaintiff alleging a procedural violation [must show] a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc); *Cent. & Sw. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 698–99 (5th Cir. 2000) (the Fifth Circuit cited the D.C. Circuit's decision in *Bentsen* with approval); *Glickman*, 156 F.3d at 613 (same); *cf. Douglas Cty. v. Babbitt*, 48 F.3d 1495, 1501 n.6 (9th Cir. 1995) (causal link still required in procedural-rights cases between government action defying or omitting the required procedure and the plaintiff's particularized, concrete injury).  In other words, "a prospective plaintiff must demonstrate that the defendant caused the particularized injury, and not just the alleged procedural violation."  *Bentsen*, 94 F.3d at 664. The question is whether there is a factual dispute material to determining whether the decrease in Ware's enjoyment of the park and arboretum is fairly traceable to the Highway 290 project that allegedly required a Section 4(f) evaluation the defendants failed to conduct.

Ware's declarations show that noise-level increases from past construction projects have negatively affected his use of the park and arboretum.  They say nothing about the Highway 290 project, how that impacts noise levels beyond the construction projects that occurred before, or how

17

those specific noise-level increases will affect the recreational value of Memorial Park and the Houston Arboretum to Ware.  The projects Ware discussed in the declarations predated the Highway 290 project and the 2013 final agency action by years.  Ware's declarations stated that the noise levels in Memorial Park and the Houston Arboretum increased because of construction projects in 1992, 2001, 2003 to 2006, and 2003 to 2008.  These are the changes, he alleges, that produced more traffic and higher roadway elevations and used concrete tining, a technology since jettisoned.  Although Ware alleges various problems with the past projects predating this Highway 290 project, he does not allege or present facts showing that the pre-Highway 290 construction projects he complains of failed to comply with Section 4(f).  He does not address or explain how a 2013 agency decision that the law does not require further analysis of noise impacts on the park and arboretum and another full environmental-impact statement is traceable to his present, as opposed to past, injuries.

Ware insists that "[i]t is clear from [his] declarations regarding his experience with noise . . . that the parklands have excessive noise [that] has caused a diminution in his ability to use the parklands."  (Docket Entry No. 143 at p. 25).  But a plaintiff's declaration that he "had suffered injury in the past from development . . . does not suffice [to establish standing]" when the past development "was not tied to application of the challenged regulations" and when "it relate[d] to past injury rather than imminent future injury . . . ."  *Summers*, 555 U.S. at 495.  After all, "[i]n the context of prospective injunctive and declaratory relief, past exposure to illegal conduct, by itself, does not evince a present case or controversy and thus cannot establish standing." *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).  The plaintiff must instead "allege facts from which it appears there is a substantial

likelihood that he will suffer injury in the future.'" *Hall v. Smith*, 497 F. App'x 366, 374 (5th Cir. 2012) (per curiam) (alteration omitted) (quoting *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003)).

In Ware's response to the defendants' summary judgment motions, he contends that the defendants admitted in their answer that the Highway 290 work will itself increase traffic, showing that "[t]he harm is imminent and is fairly traceable to the project." (Docket Entry No. 143 at p. 26). The defendants "admit[ted] that some traffic from U.S. 290 will continue to IH-610 or IH-10, and that IH-610 and IH-10 pass Memorial Park and the Houston Arboretum . . ., in part." (Docket Entry No. 129 at ¶ 82). Even if the Highway 290 project is projected to increase traffic beyond the increases resulting from earlier projects, that does not show or support an inference that the Highway 290 project has or will negatively affect Ware's recreation in the park and arboretum beyond the negative effects caused by the construction projects from 1992 to 2008. A connection between the Highway 290 project and more traffic does not support an inference that the project will affect Ware's concrete, particularized interest in the recreational enjoyment of Memorial Park and the Houston Arboretum. *See Lujan*, 504 U.S. at 566 ("[S]tanding . . . requires, at the summary judgment stage, a factual showing of perceptible harm."); *see also Laidlaw*, 528 U.S. at 705 (the defendant's conduct "*directly* affected [the plaintiffs'] recreational, aesthetic, and economic interests." (emphasis added)); *Cent. & Sw.*, 220 F.3d at 700–01 (plaintiff failed to show "the possibility that [pollutants] disposed of in his town's landfill could contaminate the aquifer that supplies his drinking water."). Without some record evidence linking the current Highway 290 project or the Section 4(f) violation to the plaintiff's concrete and particularized future injury, not past injuries caused by previous construction projects, a causal link between the challenged project and the alleged injury requires "conjecture or hypothesis" and does not support standing to sue. *Johnson v. Moore*, 958 F.2d 92,

94 (5th Cir. 1992).

The summary judgment record does not appear to give rise to a factual dispute material to determining whether the injury alleged is fairly traceable to the Highway 290 project. But because Ware's pleadings and briefs are so unclear and hard to understand, other standing issues and the merits of the APA claim are also addressed.

### 3.   Redressability

"[I]n a procedural rights case . . . a plaintiff is not held to the normal standards for redressibility [sic] and immediacy." *Glickman*, 156 F.3d at 613. As the Supreme Court has explained:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Lujan*, 504 U.S. at 572 n.7. As a result, Ware need not show "that (1) the agency action would have been different but for the procedural violation, and (2) court-ordered compliance with the procedure would alter the final result." *In re Endangered Species Act Section 4 Deadline Litig.*, 704 F.3d 972, 977 (D.C. Cir. 2013) (alteration omitted) (quotation mark omitted).

"[A]lthough a procedural rights plaintiff is not held to the normal standards for redressibility [sic], in the sense that the plaintiff need not show that the procedural remedy that he is requesting will in fact redress his injury, the plaintiff must nonetheless show that there is a possibility that the procedural remedy will redress his injury." *Glickman*, 156 F.3d at 613. "In order to make this

showing, the plaintiff must show that 'the procedures in question are designed to protect some threatened concrete interest of [his] that is the ultimate basis of [his] standing.'" *Id.* (quoting *Lujan*, 504 U.S. at 573 n.8).

"The substantive harm contemplated by [Section] 4(f) is the actual harm to parkland or historic sites that will occur if the Secretary of Transportation does not (1) consider every prudent and feasible alternative to using the land, and (2) make all possible plans to minimize the harm, if use is required." *See Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002). The harm encompasses potential noise-level increases caused by a construction project using public park lands. Under certain circumstances, Section 4(f) requires the consideration of noise-mitigation measures. *See Prairie Band*, 684 F.3d at 1014–17. The Section 4(f) procedures are "designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of . . . standing," in this case, the noise levels in Memorial Park and the Houston Arboretum. *See Lujan*, 504 U.S. at 573 n.8. The record supports an inference that Ware suffered an injury that could be redressed through the Section 4(f) procedures.

The standing analysis leads to the conclusion that while redressability is satisfied, traceability is not. That would require granting the defendants' summary judgment motion and denying Ware's motion because he fails to meet his burden to show standing to assert the APA claim.[3]

### D.     The APA Claim

Even if Ware had standing to sue, he has not shown that the defendants' final agency action was arbitrary and capricious, and the defendants have shown that it was not.

---

[3] Because Ware neither has Article III standing nor prevails on his APA claim, as discussed below, whether he has zone-of-interest standing under the APA is not analyzed.

The parties agree that the Highway 290 project did not physically use land in Memorial Park or the Houston Arboretum.  The issue is constructive use.  The defendants contend that they did not act arbitrarily and capriciously in determining that the Highway 290 project would not constructively use the park or the arboretum and that Section 4(f) did not apply as a result.  In the September 2013 Revised Record of Decision, the Federal Highway Administration relied on the results of a Texas Department of Transportation study of noise proximity impacts to conclude that "the impact of projected traffic noise levels of the proposed highway project do not exceed the [federal] noise abatement criteria as contained in 23 C.F.R. § 772, Table 1."  (Docket Entry No. 85, Ex. 1 at p. 13).  "In other words, any park that is located approximately 400–500 feet or more from the edge of pavement would experience noise levels below the noise abatement criteria for parks . . . ."  (*Id.*).  The parties do not dispute that the park and the arboretum are located more than 400 to 500 feet from the edge of the roadway pavement.

A noise-level increase is not constructive use if "[t]he impact of projected traffic noise levels of the proposed highway project on a noise-sensitive activity do not exceed the FHWA noise abatement criteria as contained in Table 1 in part 772."  23 C.F.R. § 774.15(f)(2).  The defendants determined that the highway project would not cause noise levels to exceed the criteria for considering or requiring added noise-abatement measures and would not otherwise substantially impair activities in the park and the arboretum.  *See* 23 C.F.R. §§ 774.15(a), (f)(2).  Ware has not shown that these conclusions were arbitrary and capricious; the defendants have shown that they were not.[4]  The defendants reached them after extensive study, including using the most recent

---

[4]  For the first time in his reply, Ware attempts to inject extra-record evidence in support of his claim, including past noise evaluations for unrelated construction projects.  As the court has explained, the complaints about past failures to properly evaluate noise impacts "do not challenge final agency actions and,

traffic-noise model the Federal Highway Administration had approved.  (Docket Entry No. 113 at p. 3).  The administrative record in this case spans six years and is at least 40,000 pages.  (Docket Entry No. 126).  In the face of the record evidence, Ware's primary argument is that the park and the arboretum are located near the Highway 290 project and will experience noise-level increases as a result.  (Docket Entry No. 133 at p. 10–12).  But it is clear that proximity to the project is not enough to show constructive use.  *E.g.*, *Audubon Naturalist*, 524 F. Supp. 2d at 679; *Fla. Keys*, 374 F. Supp. 2d at 1153.

Ware also argues that the park and the arboretum should fall under Category A of 23 C.F.R. § 772, Table 1, not Category C.  Category C sets the noise-level threshold for Section 4(f) constructive use at 67 A-weighted decibels, whereas 57 A-weighted decibels is the threshold under Category A.  23 C.F.R. § 772, Table 1.  Category C applies to "parks."  Category A applies only to those "[l]ands on which serenity and quiet are of extraordinary significance and serve an important public need and where the preservation of those qualities is essential if the area is to continue to serve its intended purpose."  *Id.*  The Federal Highway Administration designates land under Category A on a case-by-case basis only after receiving written justification from a state highway agency.  23 C.F.R. § 772.11(c)(2)(I).  There is no legal or factual basis for requiring the defendants to classify the park or the arboretum under Category A as opposed to Category C.

Ware contends that the defendants acted arbitrarily and capriciously in failing to allow public participation and to seek approval of the project from the Houston City Council.  But these

---

in any event, are time-barred."  (Docket Entry No. 113 at p. 21–22).  Review under the APA is limited to "the administrative record already in existence, not some new record made initially in the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).  Although there are exceptions to this general rule, Ware has not made the necessary showing for them to apply.  The motion to supplement, (Docket Entry No. 144), is denied, and the motion to strike extra-record evidence, (Docket Entry No. 145), is granted.

requirements apply only when land is "used." *See* 23 C.F.R. § 774.5(b)(2); 49 U.S.C. § 303(c).

Ware's remaining arguments are conclusory, speculative, and lack legal or factual support. Even if Ware has standing to assert an APA claim, his claim fails on the merits. Ware has failed to show that the defendants arbitrarily and capriciously concluded that the Highway 290 project would not "constructively use" Memorial Park and the Houston Arboretum. The defendants have shown no constructive use and that their actions were not arbitrary and capricious.

## III.   Conclusion

The defendants' cross-motions for summary judgment, (Docket Entry Nos. 139–40), are granted, and Ware's motion for summary judgment is denied, (Docket Entry No. 133). Ware's APA claim is dismissed. The motion to supplement, (Docket Entry No. 144), is denied, and the motion to strike, (Docket Entry No. 145), is granted. An order of dismissal is separately entered.

SIGNED on March 30, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

24